# EXHIBIT B

BEFORE THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA, . Case Number 23-cr-166

Plaintiff,

vs.

FIROZ PATEL, . Washington, D.C. May 30, 2023 3:14 p.m.

Defendant.

\- - - - - - - - - - - - - - - -

TRANSCRIPT OF DETENTION HEARING
BEFORE THE HONORABLE DABNEY L. FRIEDRICH
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the United States: CHRISTOPHER BROWN, AUSA
ARVIND LAL, AUSA
United States Attorney's Office
601 D Street Northwest
Washington, D.C. 20579

For the Defendant: JACOB GRUBMAN, ESQ.
ALAIN IFRAH, ESQ.
JEFF IFRAH, ESQ.
Ifrah, PLLC
1717 Pennsylvania Avenue Northwest
Suite 650
Washington, D.C. 20006

Official Court Reporter: SARA A. WICK, RPR, CRR
333 Constitution Avenue Northwest
Room 4704-B
Washington, D.C. 20001
202-354-3284

Proceedings recorded by stenotype shorthand.
Transcript produced by computer-aided transcription.

P R O C E E D I N G S

(Call to order of the court.)

COURTROOM DEPUTY: Your Honor, we are in Criminal Action 23-166, the United States of America versus Firoz Patel.

If I could have counsel please approach the podium and state your name for the record, beginning with the United States.

MR. BROWN: Good afternoon, Your Honor. AUSA Chris Brown for the government, and with me at counsel table is AUSA Arvind Lal.

THE COURT: Good afternoon.

MR. GRUBMAN: Good afternoon, Your Honor. Jacob Grubman and Alain Ifrah for the defense. Joining me at counsel table is Jeff Ifrah of the same firm.

THE COURT: Good afternoon. Sorry to keep all of you waiting. It's been one of those days.

I have before me the government's appeal to overturn Magistrate Judge Meriweather's order denying the government's motion for detention. I've reviewed the briefs.

Is there any additional argument, any additional information you would like to make the Court aware of?

MR. BROWN: Your Honor, the government doesn't have anything in particular beyond what is stated in our briefs. We're happy to answer questions. I think I would -- for the Court's attention, I would simply focus on 3142(g)(3)(B), which

is the statutory factor that the Court is required to take into account here, which is whether, at the time of the current offense or arrest, the defendant, the person, was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence.

That factor applies here. The offense was committed while Mr. Patel was pending his self-surrender in the previous prosecution, the Payza conspiracy case. And I just wanted to make the point that that factor distinguishes this case in front of the Court today from the case that Judge -- then-Judge Brown-Jackson considered in the previous prosecution. It not only distinguishes it, but it should color the Court's evaluation of all of the other 3142(g) factors: The nature and the circumstances of the offense, the weight of the evidence, the history and characteristics of the defendant, of which this is a specific factor, and the probability of, frankly, future obstructive acts by the defendant. All of those are made probable by the fact that the defendant did not respect the Court's previous trust in him to stay on a release pending his self-surrender.

THE COURT: Understood. It clearly colors the Court's view. The question is, to what extent does that negate his performance previously?

MR. BROWN: Yes, Your Honor. That is a fair question. That is the question Judge Meriweather grappled with.

Reasonable people could disagree. But the government's contention is that is the critical factor. If you look at the history or the nature and circumstances of the offense, this is not just a money laundering offense involving $24 million. It's a money laundering offense with intent to conceal proceeds that would have been subject to forfeiture in a prior criminal case.

THE COURT: And it's particularly egregious that the Court was misled, Judge Brown-Jackson, in terms of the need to delay surrender.

MR. BROWN: Your Honor, I don't know how much of the defendant's -- the defendant did move to continue his self-surrender date. I can't speak to how much of that was legitimate health concerns. Obviously, that was during the COVID pandemic.

The fact of the matter is that the offense conduct here occurred while the defendant, on his own motion having asked to extend that date, while he was awaiting his self-surrender date.

So there is -- we did not charge -- the grand jury did not return an indictment for obstruction, but this is a kind of concealment/money laundering that certainly sounds obstructionist. There's certainly an element of deceiving and committing a fraud on the Court by concealing these assets that were involved in the Payza conspiracy and would have been subject to forfeiture in that case.

THE COURT: The other factor that you mentioned is the

likelihood of future obstructive acts, but you're not arguing in terms of danger to the community that he should not be on release? You're just simply arguing risk of flight; correct?

MR. BROWN: Yes, your Honor. We're arguing risk of flight, but we think that factor plays into it, because part of the Court's analysis is whether there are any conditions or combination of conditions that will reasonably assure the person's presence at trial. And the defendant's prior conduct undermining the trust of the Court, it certainly should play into the Court's analysis here about whether he is a risk of flight.

THE COURT: Understood. Okay. Thank you.

Mr. Grubman?

MR. GRUBMAN: Thank you, Your Honor.

Similarly, the defendant substantially relies on the arguments raised in our papers, but I have a few points to add to supplement those arguments and also to respond to some of the points raised by the government today. And of course, I'm also glad to focus on particular issues that Your Honor is concerned about or answer any questions.

Ultimately, the one question for the Court to answer in this case is, do conditions exist that will reasonably assure this defendant's appearance as required. As Magistrate Judge Meriweather concluded at the prior hearing last week, the four factors under Section 3142(g) unequivocally answer that question

in the affirmative.

THE COURT: Did she say unequivocally?

MR. GRUBMAN: Your Honor --

THE COURT: I thought she struggled.

MR. GRUBMAN: Your Honor, Magistrate Judge Meriweather thoroughly weighed the factors under 3142(g) and ultimately concluded that, based on this defendant's unique history of complying with appearance requirements in two prior cases, including one case before this court that involved substantially more severe criminal allegations against the defendant, that that factor and the other Section 3142(g) factors on balance favor pretrial release subject to certain conditions.

Your Honor, in this case, the government points to Section 3142(g)(3)(B), specifically whether the defendant was under effectively court supervision at the time that the alleged offense occurred. The government points to a couple of sections under 3142(g), and I think the point that the government is making ultimately speaks to the nature and circumstances of the alleged offense and the weight of the evidence against the defendant in this case. So I would like to address those two factors briefly.

I'll state at the outset that again, we view this defendant's history and characteristics as strongly favoring pretrial release in this case. But speaking to the two 3142(g) factors that the government seems to focus on today, the nature

and circumstances of the offense and the weight of the evidence, first, the government has dramatically overstated the seriousness of the alleged offense.

Mr. Patel -- as indicated in the prior case, Mr. Patel and his brother operated a global money services business. So it's important to note at the outset that although the sums that we're discussing today in this case and in the prior case are in the tens or hundreds of millions of dollars, these are customer funds. In operating a business like this, the business receives some small percentage of those funds.

So I just wanted to note, we're not talking about personal funds owned by Mr. Patel. And that speaks to his inclination to come to court and defend himself in these proceedings. The Bitcoin at issue in this case belongs to customers of his business, and Mr. Patel is committed to appearing in court defending himself and recovering those funds.

In fact, the government, in prior discussions with previous counsel, said that civil forfeiture was on the table in this case. If Mr. Patel agreed to civil forfeiture, the government previously said that he would be released and that would be the end of this case. If Mr. Patel were inclined to effectively release the funds to the government and to go home and leave it there, he would not have -- he would have agreed to that offer. And instead, he's continuing to defend himself and continues to do so in this proceeding.

I would also like to speak to the specific allegations that the government is raising in this case. The transaction at issue, notwithstanding the prolonged discussion by the government in its papers, is not particularly complicated. In April of 2021, Mr. Patel caused 450 Bitcoin to be transferred between two blockchain.com accounts.

The government leans heavily into innuendo throughout its paper. For example, the affidavit underlying the original complaint says, "Although cryptocurrencies such as Bitcoin have legitimate uses, cryptocurrency is also used by individuals and organizations for criminal purposes." Well, that could be said of nearly every tool available to U.S. citizens.

The government also generally suggests that Mr. Patel's business was wholly fraudulent and illegal, but it can point in its papers to exceedingly limited instances of business involving customers engaged in potentially unlawful activity. And even that conduct is not traceable to Mr. Patel or Payza, which again was merely a money services business. Mr. Patel was indicted in the previous case because he interacted with high-risk clients, but that doesn't mean that the funds at issue are wholly accounted for by unlawful activity.

And I would like to address something that the prosecution raised today. The government says that the funds involved in the present case, the 450 Bitcoin, were also involved in the scheme underlying the prior case.

The government doesn't actually assert evidence suggesting that these funds were related to unlicensed money transmission, which underlied Mr. Patel's prior indictment and his guilty plea in July of 2020. There isn't a specific allegation that these funds ever touched U.S. customers or U.S. financial institutions such that the government could bring a case against Mr. Patel for transacting in these funds.

And that speaks to the second 3142(g) factor that I wanted to discuss today, which is the weight of the evidence against Mr. Patel. Both 18 U.S.C. Sections 1956(a)(1)(B)(i) and Section 1957, the two statutes identified in the indictment, require a finding that the funds involved in the transaction at issue were the proceeds of specified unlawful activity.

Now, it's clear that in the prior case Mr. Patel agreed to plead guilty on one charge of conspiracy related to unlicensed transmission of money in the United States. But at the time, the government was aware that Payza was a global business. The government's papers in this case acknowledge that Payza was operating in dozens of countries around the world, and the government doesn't allege that all funds touched by Payza in any way related to Mr. Patel were caught up in those offenses, specifically in unlicensed money transmitting in the United States.

The assets at issue here are Bitcoin. They were transferred between two blockchain.com accounts, blockchain.com

being a U.K. entity, and Mr. Patel is, of course, a Canadian national, and we're talking about accounts registered to entities and individuals located in Belize and India.

THE COURT: So you're saying the Court doesn't have jurisdiction over any of this? Is that what you're arguing?

MR. GRUBMAN: Your Honor, the defense is arguing the government has not actually alleged that Mr. Patel engaged in conduct covered by either Section 1956 or 1957.

THE COURT: I want to make sure I understand. Are you saying that none of this, none of the funds, none of the activity took place in the United States?

MR. GRUBMAN: At this stage, Your Honor, it's the government's burden to prove by a preponderance of evidence that pretrial detention is appropriate for this defendant.

THE COURT: Understood. But I'm just wondering, are you arguing here that they can't prove any sort of nexus to the United States?

MR. GRUBMAN: Your Honor, all I'm suggesting at this point is that the government hasn't alleged facts that meet the elements of the criminal statutes cited in the indictment, which speaks to the weight of the evidence in this case.

Mr. Patel has a strong defense based on the lack of those allegations by the government which would support pretrial release. Specifically, the Court is looking to the question of whether the evidence is so great that a defendant is likely to

flee rather than facing criminal charges. In that way, it's tied up in this defendant's history of appearing in court and the seriousness and circumstances of the criminal actions at issue. But ultimately, looking at the allegations made by the government, the defendant has a strong defense and, therefore, has good reason to appear in court as required.

THE COURT: Sorry. Has he been indicted, or is the criminal complaint still the sole charging instrument?

MR. GRUBMAN: Your Honor, the defendant has been indicted.

The last thing I will mention is that Magistrate Judge Meriweather identified a set of conditions that could again reasonably assure this defendant's appearance in court. Those conditions did not --

THE COURT: So the grand jury has found probable cause that the government's presented enough evidence at least before the grand jury to support the charge. So I don't think at this stage I can look behind that, absent you proffering something. I have to assume that the grand jury heard sufficient evidence to indict.

MR. GRUBMAN: Understood, Your Honor. And I think that's a fair position. Ultimately, in assessing the weight of the evidence as an element of the Court's consideration under the Bail Reform Act, the Court still needs to consider the weight of evidence supporting a potential defense.

THE COURT: My real concern is on the characteristics of Mr. Patel. So on the one hand, on the positive side, he did show up last time. But again, as you've heard me express already, I'm troubled by the fact that while he's awaiting sentence, he's engaged, as found by the grand jury, in this other activity involving large sums of money, and he has not particularly strong ties to the United States.

And to what extent does that negate his good performance?

And the government just needs to show by a preponderance of the evidence. This isn't clear and convincing.

So why hasn't the government met that burden, given his failure to abide by court orders at a time when he was very much in the crosshairs, he was awaiting sentencing?

How can I trust that he will follow the conditions that this Court might set, even if it includes a U.S. surety and GPS and all that? How do I have any confidence, when he has access to the amount of funds he has and has ties all over the world, especially in Canada, that he will show up?

MR. GRUBMAN: Your Honor, addressing a few of the questions contained and relevant to this factor, first, I'd like to address the defendant's Canadian citizenship and residency.

That was equally true in relation to his prior cases. Mr. Patel traveled from his home in Montreal, where his wife and daughter live, to the United States multiple times in order to attend court proceedings as necessary. He did that in two

cases, one in the Middle District of Tennessee and one in this case. And ultimately, after he had pleaded guilty, he self-surrendered for his period of incarceration, again from Montreal to the United States. In fact, he attempted to self-surrender twice. The first time, he was blocked at the border because of the guilty plea that he had entered. That was in May of 2021. After further coordination with the government and this court, he was able to attempt to self-surrender a second time the next month, and he, in fact, did so.

I would also like to address your questions and the government's allegations concerning the timing of this transaction.

Mr. Patel operated a money services business. That's uncontested and, of course, underlies all of the facts at issue in this case and the prior case.

Given that he was facing a substantial prison term, it made sense for him to take steps to protect customer assets at that time.

Now, I will also say that the government, like I mentioned, was aware that Payza, Mr. Patel's company, had overseas operations that would continue notwithstanding his and his brother's guilty pleas and periods of incarceration. The government knew that Payza continued to have customers in various parts of the world and that it would continue to offer money services to those customers.

Here, Mr. Patel engaged in one transaction, according to the government, involving customer assets before he would no longer have access to those accounts. The government hasn't alleged that he misused customer assets. It only focuses on the specific transaction, the fact that that transaction occurred.

But again, the government knew that his company was going to continue to operate in other parts of the world. So it's not surprising that company assets were transacted during that period.

Your Honor, the last point that I wanted to raise with respect to Mr. Patel's compliance with the previous plea agreement is simply that even in light of -- even accounting for the government's allegations, which again don't clearly address any conduct that occurred in the United States, he has appeared in court notwithstanding far more serious allegations and apparently with access to far more funds.

According to the government's theory, if Mr. Patel is released, he will have access to certain undisclosed cryptocurrency accounts. The government hasn't identified any evidence that he, in fact, has these accounts, but that's the theory on the government's part.

In the prior case, in 2021, it's now clear that Mr. Patel and his company in fact did have access to substantial sums of money. As stated, this is a money services business. So that's not surprising. But even when he had access to those funds, he

appeared in court, and he self-surrendered for his prison term. He didn't misuse those funds.

THE COURT: Won't he be facing a longer period of time for this offense?

MR. GRUBMAN: Your Honor, in this case, he would be facing a substantially shorter --

THE COURT: Even with the criminal history?

MR. GRUBMAN: Your Honor, even with the criminal history, and that's because the prior case involved, according to the indictment, $250 million in unlicensed money transmission.

THE COURT: But wasn't he allowed to plead pursuant to a plea agreement, and would -- right?

MR. GRUBMAN: Yes, Your Honor, pursuant to a plea agreement, the government agreed to a shorter period of incarceration.

THE COURT: So I'm wondering whether, if there were no plea agreement, whether he would be facing larger exposure here.

MR. GRUBMAN: Your Honor, I think in comparing a scenario in which there's no plea agreement would require the Court to then consider the prior case in the absence of a plea agreement.

In the prior case, I don't have the numbers in front of me, but Mr. Patel faced something like 250 to 300 months of incarceration, and in this case, given the amount at issue, he's

facing substantially less than that.

THE COURT: Did he not express a desire to plead guilty early in the other case?

MR. GRUBMAN: The other case, Your Honor, was initially brought in 2018, and his guilty plea was entered in July of 2020.

THE COURT: So no, he did not express a desire to plead early?

MR. GRUBMAN: Your Honor, I wasn't personally counsel on the prior case. I could confer with my co-counsel.

THE COURT: It's all right.

MR. GRUBMAN: Your Honor, I would add lastly that Mr. Patel has a strong incentive to appear in court and defend himself. As stated, these are customer funds, and as a result of the hold placed on these funds and other assets belonging to Payza, Mr. Patel is facing legal issues in other jurisdictions around the world.

If the United States seizes these Bitcoin from Mr. Patel, his legal troubles in other countries will only be exacerbated. He has specific reason to appear in U.S. court in order to defend himself and protect these customer assets. He has previously and consistently appeared in U.S. court in order to defend himself and participate in proceedings, and he is committed to doing so in this case.

Before I conclude, I wanted to also mention that although

Magistrate Judge Meriweather did not order an appearance bond for Mr. Patel, now Justice Jackson did order an appearance bond of $300,000 in his prior case, and the defendant suggests that similar -- to the extent Your Honor has concerns, a similar appearance bond would be more than sufficient to ensure his appearance.

And I'm also happy to describe the potential for his release into the custody of a third party who served as a third-party custodian in the prior case. That was in relation to the defendant's brother, Ferhan Patel. He was charged with similar conduct in the prior case and was released to a third-party custodian.

THE COURT: This would be the same custodian?

MR. GRUBMAN: Yes, Your Honor. In that case, Ferhan Patel stayed with him for a period of seven months without issue, appearing as required. And after further proceedings and partially in light of that compliance, his conditions of release were modified, and he was allowed to return to Canada during the pendency of that case.

THE COURT: All right. Thank you, Mr. Grubman.

MR. GRUBMAN: Thank you, Your Honor.

THE COURT: Mr. Brown, if I could have you just respond to a couple of issues Mr. Grubman raised. The first is this issue of whether Mr. Patel was acting to protect customers' assets or these were personal funds. And then the other issue

is the civil forfeiture point. And finally, you haven't alleged that he's committed these crimes. I think that's taken care of by the grand jury indictment, but anything you want to add on that?

MR. BROWN: Yes, Your Honor.

With respect to the idea that he was simply acting to safeguard customer funds, that is belied by just the plain incontrovertible facts of this transaction. He established this blockchain.com account not in his own name but in his father's name, Musa Patel. He used a throwaway e-mail address, fijmeister@gmail.com. That was a thinly veiled attempt to conceal his identity. He registered it with a street address in Belize that he had previously used to establish shell companies for the Payza conspiracy. And he used the identity of another Payza employee, this Vineet Tewari, and perhaps with the cooperation of the actual Vineet Tewari, but he certainly used that name to mask his own identity in interactions with blockchain.com.

The idea that this was a business transaction to safeguard customer funds for the duration of his sentence is just belied by the plain facts.

With respect to the idea as to the civil forfeiture, it is true that during the course of the investigation into this conduct, my colleague, Mr. Lal, had conversations with an attorney in New Jersey who at the time was putting himself

forward as Mr. Patel's attorney. We don't know if he was, in fact, Mr. Patel's attorney. And there was discussion of -- those funds had been seized pursuant to a seizure warrant. That was transmitted to the U.K. There was discussion of just civilly forfeiting those funds, but that was before the full investigation and the evidence underlying it had been crystallized.

And the fact is, today as we stand here right now, this is an indicted case. The grand jury has found probable cause. And if necessary, we will carry this case to trial. There is no offer to resolve this case by way of civil forfeiture.

THE COURT: And have you calculated his exposure under the guidelines?

MR. BROWN: Yes, Your Honor. And our calculations are in ECF 18, page 20, footnote 7. It depends on the criminal history. There's one -- first of all, he won't be -- at the end of this case, he won't be in the nature of a first-time offender. So he will at least be in criminal history category II. If the additional enhancement applies under -- if the additional enhancement applies for committing a crime while on some form of criminal justice sentence, that would push him into criminal history category III.

Either way, under criminal history category II, we're at offense level 32 post-trial, which results in a period of 11 to 14 years. If he's in criminal history category III, that bumps

up to 12 to 15 years.

THE COURT: And why wouldn't that provision apply, while under criminal justice sentence? Because he hasn't been sentenced?

MR. BROWN: Your Honor, we would have to parse through the guideline itself. It's our position that that guideline does apply, but it's certainly a --

THE COURT: Because a sentence hasn't been imposed yet; is that the issue?

MR. BROWN: Any calculation of guidelines is going to be provisional at this point, but we believe, number 1 -- sorry.

THE COURT: This was for him to surrender.

MR. BROWN: The sentence had been imposed, but he hadn't yet begun to serve it. We believe that that -- and I'm sorry. I'm blanking on the guideline. We believe that it would apply, but -- sorry. It's footnote 6, 4A1.1D, which applies if the offense was committed while under any criminal justice sentence, and we believe that -- the sentence had been imposed. He hadn't yet begun serving the sentence, but he was still under a criminal justice sentence.

THE COURT: I know that the brother was detained. I can't recall whether the government sought detention for this defendant.

MR. BROWN: Maybe my colleague remembers.

MR. LAL: Good afternoon, Your Honor.

THE COURT: Good afternoon.

MR. LAL: Arvind Lal for the United States.

In the prior case, the defendant's brother, Ferhan, flew into the United States after he had been indicted, and there were arrest warrants, and he was arrested. He was initially detained, and then he was sent to live with the cousin or the relative in New York.

Firoz Patel, this defendant, was in Canada, and through counsel, we negotiated his arrival into the United States, and as a part of those negotiations, we agreed not to seek his detention. Ultimately, both Firoz Patel and Ferhan Patel were -- through agreement with government and counsel for both defendants, ultimately, we agreed pursuant to the bond that the Court set that they could stay in Canada.

THE COURT: All right.

MR. BROWN: Under any calculation, he's looking at a significant time in prison, significantly longer than the 36 months imposed for his prior case.

Moving on to the question about -- the defense has sort of argued about the weight of the evidence, arguing about how much of these funds are traceable to what he pled to.

First of all, it's important to point out what the defense is not disputing. They're not disputing the nature of the transaction. They're not disputing all of these factors that I just cited earlier about the concealment of Mr. Patel's

involvement in the transaction, the efforts to conceal his own role in this offense. They're only contesting whether the property involved in the transaction is in fact the proceeds specified in the unlawful activity, and it is.

If the Court reviews the Statement of Offense in the prior case, the Criminal Information that was filed in the prior case, there was no parsing through, well, this Payza does business in the United States, that Payza does business internationally. There was no -- it's simply false to allege that the government assumed Payza would continue doing business outside the United States.

The government forfeited the payza.com domain. Under the Statement of Offense, Payza, not a slice of Payza, but Payza, the worldwide business, was a criminal enterprise. It was a criminal enterprise because it was an unlawful money laundering transmission business and it was a criminal enterprise because it facilitated money laundering. The whole business was a criminal business. The whole business was charged in this court. And the whole business, all the property involved in that business, was subject to forfeiture.

And I would direct the Court's attention to two cases. One, the D.C. Circuit's decision in *United States v. Braxtonbrown-Smith*, 278 F.3d 1348, and the upshot of that case is simply when alleging a money laundering transaction, the government is not required to show that, you know, every single

dollar that was involved in that transaction is the proceeds of a specified unlawful activity. The government just has to show that that transaction involves the proceeds of specified unlawful activity.

And the other case is the *United States v. Sterlingov* decision just recently made by Judge Moss, 2023 WL 2387759, and in that decision, Judge Moss addressed the scope of the forfeiture provision at issue here, 18 U.S.C. 982(a)(1), which applies to both money laundering, forfeiture, and forfeiture involved in an unlicensed money transmitting business. And Judge Moss agreed that the weight of the evidence -- the weight of the case law suggests that, quote, all money transmitted through such a business is subject to forfeiture.

So it doesn't matter if those particular Payza funds were customer funds. It doesn't matter if there was a legitimate purpose for some portion of the Bitcoin that the defendant transmitted. These were all funds involved in operation of the Payza conspiracy. They would have all been subject to forfeiture, and the defendant's intent in concealing that transaction is well illustrated by the steps that he took to conceal it.

THE COURT: All right. I know I've stayed Magistrate Judge Meriweather's decision while I consider this motion. And I am going to take it under advisement, but I expect to issue a decision in the next 24 hours. But I will stay her release

order pending my ruling on this. So I will issue an order in the next 24 hours.

All right. Thank you, Counsel.

(Proceedings adjourned at 3:50 p.m.)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CERTIFICATE OF OFFICIAL COURT REPORTER

I, Sara A. Wick, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/s/ Sara A. Wick June 7, 2023

SIGNATURE OF COURT REPORTER DATE